IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

Roger Dale Burke,           )
                                      ) C/A No. 0:15-1107-MBS
              Petitioner,    )
                                      )
    vs.                       )
                                      ) **OPINION AND ORDER**
Warden Robert Stevenson,    )
                                      )
             Respondent.    )
_____)

     Petitioner Roger Dale Burke is an inmate in custody of the South Carolina Department of

Corrections. Petitioner currently is housed at the Broad River Correctional Institution in Columbia,

South Carolina. Petitioner, proceeding pro se, filed a petition for writ of habeas corpus on March

9, 2015, alleging that he is being detained unlawfully. See 28 U.S.C. § 2254.

I. BACKGROUND

     On June 15, 2000, Petitioner's wife, Jenny, moved out of their residence and into the home

of Petitioner's brother, leaving behind Petitioner and their three children. Transcript of Record, ECF

No. 10-2, 169. Petitioner eventually initiated divorce proceedings and Petitioner and Jenny shared

custody of the children.

     Petitioner asked his cousins, Marie and Christopher, to stay with him to help with the

children. One weekend Jenny picked up the children and learned that Christopher had been

molesting her daughter. Id. at 179. After Christopher was arrested, Petitioner received court

documents indicating that Jenny intended to remove the children from Petitioner's home. Id. at 187.

On Wednesday, December 19, 2000, Petitioner drove to the residence where Jenny was living with

Petitioner's brother. He parked his car behind the home and entered the front door. Id. at 191-92.

After determining no one was home, Petitioner poured a bottle of gasoline on the floor in the bedroom. Id. at 195. He heard a car pull up and realized it was Jenny and the children. Id. at 196. After Jenny and two of the children entered the residence, Petitioner came out from the back of the house and shot Jenny. Id. at 198. Petitioner left the residence with the children. He subsequently returned alone and attempted to burn down the home. Petitioner also transported Jenny's body to a secluded area and hid it under some brush. Id. at 452-53. According to William Armstrong, M.D., a forensic pathologist, Jenny was shot four times in the body, and one time in the head at very close range. Dr. Armstrong also noted ligature marks around the neck. Id. at 249-54.

Petitioner turned himself in to law enforcement the next day. He was charged with possession of a firearm during commission of a violent crime, in violation of S.C. Code Ann. § 16-23-490; attempted arson, in violation of S.C. Code Ann. § 16-11-190; burglary in the first degree, in violation of S.C. Code Ann. § 16-11-311; and murder, in violation of S.C. Code Ann. § 16-3-10. ECF No. 10-4, 138-155.

Petitioner proceeded to trial on August 23, 24, 25, and 27, 2004, in the Court of General Sessions for Lexington County, South Carolina, before the Honorable Marc H. Westbrook. Petitioner was represented by William N. Nettles, Esquire. The state opened with a description of Petitioner's actions the day of the crime, as follows in pertinent part:

> Ladies and gentlemen, December 19, 2001, was a Wednesday morning. It was a cold December morning, six days before Christmas. It was the last day of school for the kids. They had a half day of school for Christmas break.
>
> Jenny Burke went to pick up her children at school. She took them to the park to play for a little while. Jenny Burke has three children with the [Petitioner]. They are ages ten, six, and four. They played at the park for a while. Then she takes them by the Shumpert's I.G.A. out in Pelion on the way home and picked up groceries for lunch. After that they go home, they park the car, and the kids get out. Little

[daughter A.B.], six year old [A.B.], runs to the back yard to play on the swing, [son D.B.], age four, and [son B.B.], age ten, they get out with their mother. She has got the groceries. They go inside. She sets the bag of groceries down on a table in the house.

At that point from out in the hallway, the [Petitioner] comes out where he had been lying in wait. He had entered her home waiting on her return. She screams for little [B.B.] to call the police. Little [B.B.] is standing there in the same room with his mother, watches his dad pull out a .380-caliber pistol and shoots his mother in the chest. Little [B.B.] grabs his little brother and runs out the front door. He runs to the back yard where [A.B.] is and grabs her. While he is back there, he hears several other shots. While on the inside, the [Petitioner], he shoots Jenny Burke again and again. She falls dead right next to the Christmas tree. The [Petitioner] leaves the house, walks outside, rounds up his children. He gets a station wagon that he has hid behind the house, in between the house and the woods, put them in the car.

As they are driving off, he gives them Hardee's breakfast biscuits that he had bought earlier in the day. He drives them out to the woods, takes them to a pond that he knew of, a secluded pond in the middle of the woods. They sit around the pond. They eat their Hardee's biscuits. By now it's about mid-afternoon. The [Petitioner] gets up and leaves. He gets in the car and leaves his children sitting there by the pond on that cold day. He goes back over to Jenny Burke's house where her dead body is still lying next to the Christmas tree. He gets her dead body, puts it in the station wagon. He goes in and he tries to burn the house down. He tries to hide what he has done. He puts her body in the station wagon and drives off, drives out in the country, out near Cedar Branch Road. He goes to an old place that he had been before out in the woods and parks the car. He pulls Jenny Burke's dead body out of the car and drags it over to a cutover. He covers her body up with sticks debris, branches. He leaves her there. He gets back in the car. He drives back over to the pond where he has left his children. He picks his children up, puts them in the car. By now it's about dark. They drive around. He drives over to his aunt's house. That's where he gets out. He leaves his children in the car, no car running, no heat, it's cold.

Ladies and gentlemen, on December 19, 2001, the [Petitioner] took it upon himself to be the judge of his ex-wife. He was her jury. And when he convicted her, he sentenced her to death.

ECF No. 10-1, 62-65.

Trial counsel opened and addressed the jury regarding the relationship between Petitioner and Jenny, and stated, among other things:

3

[Petitioner] made some bad decisions. At the end of this case, sadly, sadly, I feel that chances are – and as a matter of fact, I will tell you based on the evidence and based on what you are going to hear [Petitioner] told the police when he turned himself in – . . . you are going to convict him of burglary. You are going to convict him of having a firearm during the course of a violent crime. You are going to do that. You will convict him . . . of arson. And he is all those things, but what he is not is a murderer.

You see, for someone to be convicted of murder, they have got to have a heart devoid of all social duty. [Petitioner] went over to that house and committed a burglary because he wanted to talk about why it was they were going to take away his children. And the situation – and he saw things and he perceived things in that house that caused him, perhaps wrongly, to think and enraged him to such a degree that he made some tragically bad decisions.

       . . . .

His wife left him for his brother, and then they were trying to take the kids and move the kids in with his brother. That made a man think not exactly right.

ECF No. 10-1, 67-70.

The state called Scottie Frier, a sergeant with the Lexington County Sheriff's Department. ECF No. 10-1, 152. Frier testified that he spoke with Petitioner on December 20, 2001, after Petitioner turned himself in. Frier advised Petitioner of his Miranda rights, after which Frier wrote down Petitioner's confession. Petitioner reviewed and signed the statement as factual. Id. at 174.

The state moved to place the writing into evidence. Trial counsel objected to introduction of the writing as a "statement" because Petitioner did not write it in his own words. Trial counsel argued that the written document was not Petitioner's written statement, but a police officer's memorialization of what occurred. Id. 172-73. The trial court ruled that Petitioner ratified the document by signing it, and therefore overruled the objection. Id. at 182. Frier then read the statement to the jury as follows:

I bought a .380 at Moseley's on Wednesday at approximately 10:40 a.m. I had

4

applied for the gun on Friday. This was after bond court concerning Christopher and what he did to my little girl. I took the gun to the wash hold and shot it a couple of times. I bought the gun for $150. I called [Jenny] on her cell phone. She said she wasn't going to come off of the papers. She said, quote, now it's your turn to pay child support, you son of a bitch, end quote. I went to the house. I went inside her house. She was living with my brother. I got the address from the papers. When I went into the house, I got a Pepsi bottle with some gas in it. I poured the gas on the sofa and in the bedroom.

When . . . Jenny got to the house off of [redacted address], I was in the . . . hallway to the right. I could not be seen when the door was opened. When I came out, Jenny saw me. I said, quote, Jenny, why are you trying to take the kids from me, end quote. She just started screaming. [Son B.B.] was standing there. I pulled the gun out of my hip pocket. Jenny had started to go for the phone when she screamed. I shot Jenny. She grabbed her chest. I think she said, quote [B.B.] call the law, end quote. I shot her, quote, one more or two more times, end quote. It might have even been four, end quote. Quote, she grabbed her chest. She went for the phone. She hit the floor. She tried to get back up. I tried to put the gun to her chest, but I may have hit her in the head, end quote. [B.B.] ran out the back door. I think [Son D.B.] was . . . . standing there also. I think [D.B.] saw it. I went outside and told the kids to get in the car. I had backed the car in between the trailer and a tree so she couldn't see the car.

I took the kids and we ended up at a pond near some woods and ate some food that I had bought at Hardee's. I told [B.B.] to stay there. I left [B.B.] in charge of the little kids at the pond. . . . I went back to Jenny's house. I took Jenny out of the house. I put her in the car. I drove out 178 to Samaria. I turned on the concrete road. I went on some dirt roads back to [178]. Then I went to a place I knew before. . . . It is up on Elbert Taylor Road. It is land I knew was there. I went down Elbert Taylor Road to another dirt road, turn right. Go straight. Land on the left. I put Jenny under some pine straw and limbs. I then went back to where the kids where.

ECF No. 10-1, 186-89.

Frier testified that after the first statement, Petitioner guided law enforcement to the location of Jenny's body. Id. at 191. Petitioner subsequently gave a second interview, which was recorded as follows by Frier:

After I shot and left, I later got worried and I started thinking about what I had done. I decided to go back to the house to remove the body. I thought about burning the house. I thought that it might look like Jenny left with the kids and burned the house.

5

> I started to try and light some wallpaper on fire. I did this when I removed the body. I also wanted to get rid of that blood evidence. That is why I tried to burn the house. The paper was burning when I left. I also picked up about three shell casings. I thought I got them all. I threw them out of the car window, I'm not sure where.

ECF No. 10-2, 19-20.

Trial counsel called several of Petitioner's friends, who testified that Petitioner loved his children and that the prospect of losing the children "was tearing him apart." ECF No. 10-2, 57. One witness, Clint Addy, testified that Petitioner lost weight and was "blowing off steam" after Jenny left. Id. at 74. Under cross-examination, Addy testified that several months before the shooting Petitioner talked about killing his wife and placing her in a vat of caustic chemicals to dispose of the body. Id. at 76-78. Addy stated, "I knew that he never meant it because all he ever did was talk junk." Id. at 78. Addy admitted that after he learned Jenny and the children were missing, but before her body was found, he called law enforcement and reported Petitioner had threatened to place both his wife and his children in the vat. Id. at 80-81.

Petitioner testified in his own behalf. Petitioner's testimony mirrored that of his confession to Frier, except that he testified he and Jenny had struggled over the gun. Id. at 200. According to Petitioner, he tried to shoot Jenny in the chest, and he did not realize she was shot in the head. Petitioner denied placing the weapon against her head and firing. Id. Petitioner denied that Frier had recorded their entire conversation. Id. at 207. Petitioner testified the he was "in such a state of mind . . . . I could read but it didn't click. But the way [the document] was written, it's not the full statement, the conversation we had." Id. at 208.

Petitioner testified that he was a burglar, that he had attempted to commit an arson, and that he had a firearm in his possession during the course of the crime. Id. Petitioner denied being a

murderer.  Petitioner testified:

> Bad decisions was made.  My heart wasn't a heart of mischief, if I could describe it.
> I loved them, . . . to the point of making a good man do bad shit.  I spoke about they
> didn't believe in God. [My brother], he don't believe in church. . . . But there was a
> God that day. . . . And it spared by life and it spared [my brother's life], too.

Id. at 210.

On cross-examination, Petitioner denied trying to clean up the blood after he returned to the

residence to retrieve Jenny's body.  ECF 10-3, 18.  Petitioner admitted that he picked up three shell

casings and then tried to burn the house down.  Id.  Petitioner was shown a picture of the kitchen

sink at the scene of the crime.  Petitioner testified:

> Q.    And it looks that the sink, and I guess the base of the faucet, isn't that correct,
>       Mr. Burke?
>
> A.    I think that's the sink and the stopper laying beside it.
>
> Q.    What about that right there (indicating), is that the faucet?
>
> A.    Yes, sir.
>
> Q.    And right down there on the faucet, it looks like something at the base of that.
>       What is that, Mr. Burke?
>
> A.    It's red.  It could be rust or it could be blood.  I'm not sure.  It's red.  But if
>       you look I think that's one of those old style sinks, one when water leaks
>       around the faucet like that, it looks like rust to be sir.
>
> Q.    When did you wash your hands, Mr. Burke?
>
> A.    I never did.

ECF No. 10-3, 20-21.

The solicitor again stated in closing argument that Petitioner had been his wife's judge, jury,

and executioner.  ECF No. 10-3, 50, 58.  According to the solicitor, Petitioner's acts demonstrated

ill will and depravity of heart sufficient to find murder.  The solicitor observed, among other things:

> We know what he did and how he decided to execute her.  Y'all will have his statement in back.  You will know what that final shot was after he decided to be her judge, her jury, and her executioner.  You will know from his own statement.
>
> What does he say?  This isn't stuff that this man is making up.  This is stuff that he was telling.  Y'all get a chance to judge the credibility.  Who wants to be self protected up there?  Who has something to gain?  Who has something to lose?
>
> Sergeant Frier doesn't.  He is taking a statement.  What reason does he have to lie?  [Petitioner] told him: Oh, I didn't tell you any of those things.  What would that be?  Why wouldn't he tell him all those things at that point in time?
>
>             . . . .
>
> [Petitioner] can't dispute that he killed her.  So he is trying to pull one over on you as to why.  Y'all judge the credibility.  Y'all heard the people from that witness stand.  Y'all know who has something to gain and y'all know who [has] something to lose.
>
>             . . . .
>
> [Petitioner] will admit a lot, but he has to; doesn't he?  Like my grandfather said: The best lie contains 90 percent truth, doesn't it?  He can't get around the forensic stuff.

Id. at 50-59.

The trial judge charged the jury both as to murder and voluntary manslaughter.  As to murder, the trial judge instructed the jury that murder is defined as the killing of any person with malice aforethought, either express or implied.  Id. at 69.  The trial judge further instructed the jury as follows, in part:

> Malice may . . . be implied from the willful, deliberate, and intentional doing of an unlawful act without just cause or excuse or from the use of a deadly weapon.
>
> Now, the resulting implication only permits rather than requires you to infer malice.  This permissive inference, as we call it, is of an evidentiary nature.  Again, the implication does not require you to infer malice, it only permits you to do it.

8

In other words, the inference of malice from use of a deadly weapon is simply an evidentiary fact to be taken into consideration by you as the jury, along with all of the other evidence in the case. It is to be given such weight as you the jury determine it should receive.

The inference of malice may be drawn from proof of the use of a deadly weapon if you conclude that it's proper after considering all of the facts and circumstances in evidence.

ECF No. 10-3, 71-72.

Petitioner was found guilty on all counts. The trial judge sentenced Petitioner to five years in prison for possession of a weapon during commission of a violent crime; twenty years in prison for attempted arson; thirty years in prison for burglary; and life in prison for murder, said sentences to run concurrently. ECF No. 10-3, 104.

Petitioner, through counsel, timely appealed his conviction and sentence. An <u>Anders</u>[1] brief was filed with the South Carolina Court of Appeals raising the following issue:

Whether the court erred by allowing the state to introduce a summary of appellant's interview with Detective Scottie Frier as appellant's "statement," since both Frier and appellant testified the summary only contained selected items Frier chose to write down, and this document should not have been admitted into evidence under these circumstances?

ECF No. 10-6, 4.

The South Carolina Court of Appeals dismissed the appeal by unpublished opinion on January 24, 2007. ECF No. 10-3, 106. Petitioner filed a pro se petition for rehearing, which petition was denied on March 22, 2007. ECF Nos. 10-7, 10-8. Remittitur was issued on April 26, 2007.

Petitioner filed an application for post-conviction relief (PCR) on May 11, 2007, as well as what appears to be a duplicate PCR application on June 5, 2007. Petitioner raised the following

---

[1] <u>Anders v. California</u>, 386 U.S. 738 (1967).

9

grounds for relief:

> Issue A: Was defense counsel ineffective in failing to place objection to the State's opening argument and misconduct at trial?
>
> Issue B: Was defense counsel ineffective in failing to present an insanity defence *[sic]*?
>
> Issue C: Did the Solicitor's actions amount to prosecutorial misconduct?
>
> Issue D: Was defense counsel ineffective in failing to place objection to the State's inherently prejudicial final summation?
>
> Issue E: Was defense counsel ineffective in failing to place objections to take exceptions to the trial court's erroneous malice instruction?

ECF No. 10-3, 107-155.

A hearing on Petitioner's PCR application was held on August 14, 2012, before the Honorable W. Jeffrey Young. Petitioner was represented by PCR counsel. Petitioner testified regarding the testimony of the witnesses that had raised issues as to his mental state at the time of the crime. ECF No. 10-4, 40-70. Petitioner argued that trial counsel should have had an expert examine Petitioner to support an insanity defense. Id. at 72. Petitioner contended that the jury did not take his mental state into consideration because they were not instructed to do so. Id. at 73.

With respect to prosecutorial misconduct, Petitioner next testified that the solicitor's opening argument was designed to inflame the jury and make Petitioner out to be a liar and cold, heartless person. Id. at 76-77. Petitioner asserted that the solicitor insinuated that he had washed his bloody hands in a sink, which he denied; however, the solicitor had statements of persons who admitted to touching the blood who were not called to testify. Id. at 80. Petitioner denied ever making a statement to Addy that he would harm his children. According to Petitioner, the solicitor elicited Addy's testimony to influence the jury to reach a verdict based on emotion and not the facts of the

case.  Id. at 83.  Petitioner further asserted that the solicitor impermissibly vouched for Frier's testimony.  Id. at 85.  Finally, Petitioner argued that the trial judge's malice instruction shifted the burden to him to prove he did not act with malice, contrary to the South Carolina Supreme Court's ruling in State v. Belcher, 685 S.E.2d 802, 803-04 (S.C. 2009) (holding that a jury charge instructing malice may be inferred from the use of a deadly weapon is no longer good law in South Carolina where evidence is presented that would reduce, mitigate, excuse or justify the homicide).  Id. at 86.

Trial counsel also testified at the PCR hearing.  Trial counsel stated that he had not viewed insanity as a viable defense.  Id. at 107.  Trial counsel testified that he felt the best approach was to be honest with the jury and try to show why the confrontation occurred in hopes of a manslaughter verdict.  Id. at 109.  Trial counsel testified that he wished to show the jury that grief rather than malice propelled Petitioner to shoot Jenny.  Id. at 113.  Trial counsel further contended that during trial he did not view the solicitor's statements during opening and closing arguments to be objectionable.  Trial counsel also did not take issue with the malice instruction.  Id. at 115-16.

On cross-examination, trial counsel testified that he agreed a mental evaluation could have shown, instead of insanity, severe depression or some type of disorder that could have been evidence to support lack of malice and a voluntary manslaughter conviction.  Id. at 123.  However, trial counsel further testified that

> the problem would've been then the government would've gotten to examine him which would've meant I would've had to sent *[sic]* him over to Bull Street which would've meant they would've got to spend four days with him.  And the theory of the case was that, by doing it through lay testimony, I was able to get in front of the jury what was going on in his mind without exposing him to a State evaluation.

Id. at 123-24.

According to trial counsel, "The government had absolutely no evidence that [Petitioner] was

11

anything other than depressed.  So I felt that we were minimizing our exposure." Id. at 124.

On June 19, 2013, the PCR judge filed an order in which found trial counsel to be credible and Petitioner to be not credible at the PCR hearing.  The PCR judge determined that trial counsel had pursued a valid trial strategy regarding Petitioner's mental state at the time of the murder.  Regarding Addy's testimony, the PCR judge found that the benefits derived from Addy's testimony overshadowed the alleged detriment with regard to Petitioner's statements that he would kill his entire family by placing them in acid.  The PCR judge further determined that trial counsel was not ineffective for failing to object to the government's opening and closing statements.  The PCR judge stated that the government's comments at opening were merely descriptive of the murder offense, and that the statements at closing did not involve improper vouching for a state witness's credibility or pitting of witnesses against Petitioner.

The PCR judge also found that trial counsel was not ineffective for failing to object to the government's cross-examination of Petitioner regarding the blood in the sink, and that the questions were proper and inferable from the evidence presented at trial.  In addition, the PCR judge noted that Belcher was issued more than two years after Petitioner's direct appeal and was not retroactive in application.  Thus, the PCR judge found the malice instruction to have been appropriate under the law at the time of trial.  Finally, the PCR judge determined that overwhelming evidence of guilt supported Petitioner's conviction, such that Petitioner could not show that trial counsel's alleged errors prejudiced Petitioner.  The PCR judge held that all other matters were waived at the hearing, and that the PCR application should be denied and dismissed with prejudice.  ECF No. 10-4, 128-37.

Petitioner, through counsel, timely filed a petition for writ of certiorari to the South Carolina Supreme Court.  Petitioner raised the following issues:

I.      The PCR court erred in finding that trial counsel was not ineffective by calling a defense witness who testified that Petitioner had told him he planned to put his entire family in a caustic chemical tank where such testimony eliminated any chance of a jury finding Petitioner guilty of voluntary manslaughter instead of murder.

II.     The PCR court erred in finding that trial counsel was not ineffective in failing to object to the solicitors' repeated references during opening and closing arguments to the jury that Petitioner acted as "judge, jury, and executioner" where it is improper for a solicitor to officially characterize a defendant as a murderer and cold-blooded killer until the defendant has been found guilty of murder.

III.    The PCR court erred in finding that trial counsel provided effective assistance of counsel where trial counsel failed to object to the solicitor's remarks during closing argument which improperly vouched for the credibility of the State's witness and branded Petitioner as a liar and untruthful.

IV.     The PCR court erred in finding that trial counsel was not ineffective in failing to pursue an insanity defense where based upon the concern of several witnesses as to Petitioner's mental condition at the time of the shooting, trial counsel should have conducted a reasonable investigation with respect to the possibility of an insanity defense and should have requested a jury charge on the defense of insanity.

V.      The PCR court erred in finding that trial counsel was not ineffective for failing to object to the implied malice jury charge where the charge that malice may be inferred from the use of a deadly weapon is improper where evidence is presented that would reduce, mitigate, excuse or justify the homicide.

VI.     The PCR court erred in finding that trial counsel was not ineffective for failing to object to the solicitor's cross-examination of Petitioner regarding facts not supported by the evidence.

ECF No. 10-11, 2-3.

The South Carolina Supreme Court denied the petition for a writ of certiorari on October 23, 2014.  ECF No. 10-13.  Remittitur was sent down on November 10, 2014.  ECF No. 10-14.

In his § 2254 petition, Petitioner raises the following issues:

13

1. The PCR judge erred in finding trial counsel was not ineffective for failing to pursue an insanity defense.

2. The PCR judge erred in finding trial counsel was not ineffective for failing to object to improper vouching of a state's witness and pitting against Petitioner.

3. The PCR judge erred in finding trial counsel was not ineffective for failing to object to the implied malice jury charge.

4. The PCR judge erred in finding that trial counsel was not ineffective for failing to object to the solicitor's cross-examination of Petitioner regarding the blood in the sink.

5. The PCR judge erred in finding that trial counsel was not ineffective for calling a defense witness who testified that Petitioner had told him he planned to put his family in a caustic tank.

See generally ECF No. 1-2.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Paige J. Gossett for a Report and Recommendation. The petition is governed by the terms of 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.

Respondent filed a motion for summary judgment on May 26, 2015. By order filed May 27, 2015, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Petitioner was advised of the summary judgment procedures and the possible consequences if he failed to respond adequately. Petitioner filed a response in opposition on July 8, 2015. On December 18, 2015, the Magistrate Judge issued a Report and Recommendation. As to Ground One, the Magistrate Judge found the PCR judge's determination that trial counsel was credible and Petitioner was not credible had support in the record. The Magistrate Judge determined that the PCR judge reasonably found that trial counsel employed a valid trial strategy, after diligent investigation, of deciding not to pursue an

14

insanity defense. The Magistrate Judge determined that the PCR judge reasonably determined that trial counsel's strategy of making a case for voluntary manslaughter instead of pursuing an acquittal by reason of insanity fell within the range of competent professional assistance.

As to Grounds Two and Three, the Magistrate Judge agreed with the PCR judge that the solicitor's comments regarding "judge, jury, and executioner" were merely descriptive of the murder charge. The Magistrate Judge further agreed with the PCR judge that the solicitor did not improperly inject his personal opinion into his closing argument, but instead argued to the jurors that they had reasons to believe certain witnesses and reasons to doubt the credibility of other witnesses. The Magistrate Judge also agreed with the PCR judge that, given the strong evidence against Petitioner, Petitioner suffered no prejudice by any alleged deficiencies of trial counsel.

As to Ground Four, the Magistrate Judge found that the PCR judge appropriately ruled that the trial judge's malice instruction was correct as a matter of law at the time of trial, such that trial counsel was not ineffective for failing to object to the charge. The Magistrate Judge further determined that Petitioner failed to establish that the state courts' decisions were so fundamentally unfair that they resulted in a denial of due process.

As to Ground Five, the Magistrate Judge agreed with the PCR judge that trial counsel was not ineffective for failing to object during cross-examination regarding blood in the sink since the question was proper and inferable from evidence presented at trial. As to Ground Six, the Magistrate Judge found that the PCR judge reasonably determined that trial counsel's decision to call Addy to testify as to Petitioner's emotional instability prior to the murder aligned with trial counsel's trial strategy, and that the benefits derived to Petitioner from Addy's testimony overshadowed any alleged detriment. Accordingly, the Magistrate Judge concluded that the PCR judge's determinations

regarding trial counsel's performance were not contrary to, or an unreasonable application of, federal law. Therefore, the Magistrate Judge recommended that summary judgment in favor of Respondent be granted. Petitioner filed objections to the Report and Recommendation on January 5, 2016.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1). This court may also receive further evidence or recommit the matter to the Magistrate Judge with instructions. Id. This court is obligated to conduct a de novo review of every portion of the Magistrate Judge's report to which objections have been filed. Id.

## II.  DISCUSSION

A writ of habeas corpus shall not be granted for any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The limited scope of federal review of a state petitioner's habeas claims is grounded in fundamental notions of state sovereignty. Richardson v. Branker, 558 F.3d 128, 138 (4th Cir. 2012) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)). When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state

sovereignty.  Id. (citing Harrington, 562 U.S. at 103).  A federal court's power to issue a writ is limited to exceptional circumstances, thereby helping to ensure that "'state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.'" Id. (citing Harrington, 562 U.S. at 103). The restrictive standard of review "'further[s] the principles of comity, finality, and federalism.'"  Id. (citing Williams v. Taylor, 529 U.S. 362, 364 (2000)).  "'The pivotal question is whether the state court's application of the [applicable federal legal] standard was unreasonable.'"  Id. (quoting Harrington, 562 U.S. at 103).   So long as fairminded jurists could disagree on the correctness of a state court's decision, a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court.  Id. (citing Harrington, 562 U.S. at 102).

Petitioner contends that he received ineffective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  The petitioner first must show that counsel's representation fell below an objective standard of reasonableness.  Id. at 687–88.  In making this determination, a court considering a habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  However, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  Id. at 691-92 (citing United States v. Morrison, 449 U.S. 361, 364–65 (1981)).  "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Id. at 692.

<u>Law/Analysis</u>

A.     <u>Failure to Raise an Insanity Defense</u> (Ground One)

Petitioner contends the Magistrate Judge erred in not finding trial counsel ineffective for failing to raise an insanity defense but instead making a case for voluntary manslaughter.  Petitioner argues that facts in the record support that trial counsel should have had Petitioner's mental state evaluated.  However, as the Magistrate Judge properly noted, trial counsel considered the possibility of a mental evaluation and decided against it in order to prevent the state from seeking its own evaluation.  Trial counsel was able to present lay witness testimony as to Petitioner's state of mind prior to the murder in an attempt to rebut a finding of malice.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).  Petitioner has failed to overcome this presumption.  Petitioner's objections are without merit.

B.     <u>Failure to Object to Opening and Closing Arguments</u> (Grounds Two and Three)

Petitioner asserts that the Magistrate Judge erred in ruling that (1) the solicitor's opening comments regarding the murder were merely descriptive of the offense; (2) the solicitor did not improperly vouch for the credibility of Frier.

As a general rule, inflammatory remarks which are calculated to appeal to the passions or prejudices of a jury should be affirmatively condemned. <u>State v. Bennett</u>, 632 S.E.2d 281, 288 (S.C. 2006) (citing <u>S.C. State Highway Dep't v. Nasim</u>, 179 S.E.2d 211, 213 (S.C. 1971)).  The arguments must be viewed in the context of the entire record, and the relevant question is whether the

18

comments infected the trial with unfairness so as to make the resulting conviction a denial of due process. Id. (citing State v. Patterson, 482 S.E.2d 760, 766 (S.C. 1997)). In this case, the solicitor's allegedly improper comments were not unreasonable in light of the seriousness of the charge. As to the solicitor's purported vouching of Frier, the Magistrate Judge properly observed that the solicitor did not indicate a personal belief in the credibility or honesty of the state's witness. Rather, the solicitor argued to the jury that there was no reason for Frier to fabricate his testimony. Trial counsel was not ineffective for failing to object to the solicitor's statements. Petitioner's objection is without merit.

C.    Improper Jury Instruction (Ground Four)

Petitioner argues the Magistrate Judge erred in finding State v. Belcher, 685 S.E.2d 802 (S.C. 2009), to be inapplicable to his case. Petitioner relies on precedent providing that, in a murder case, malice may be *presumed* (1) from the willful, deliberate and intentional doing of an unlawful act without just cause or excuse or (2) from the use of a deadly weapon deliberately, intentionally, and without just cause or excuse. See Arnold v. State, 420 S.E.2d 834, 838 (S.C. 1992). The United States Supreme Court held both of these presumptions to be an unconstitutional sifting of the burden of proof from the prosecution to the defendant in Yates v. Aiken, 484 U.S. 211 (1988). The court notes that the trial judge did not utilize the improper "presumed" language in the jury charge at issue. Thus, as the Magistrate Judge properly noted, the law charged by the trial judge was correct as a matter of state law at the time of Petitioner's trial. Trial counsel was not ineffective for failing to object to the jury charge. Petitioner's objection is without merit.

D.    Failure to Object During Cross Examination (Ground Five)

Petitioner contends the Magistrate Judge erred in finding the cross-examination regarding

possible blood in the sink was proper and inferable from the evidence presented at trial. The court disagrees. There was evidence presented that Petitioner attempted to clean up the scene of the crime in order to suggest Jenny had taken the children and left. By Petitioner's own admission, he removed the bloody body from the residence; a reasonable inference would be that he washed his hands after doing so. Further, as the Magistrate Judge noted, in view of the substantial evidence presented at trial, there is no reasonable probability that the result of the proceeding would have been different had trial counsel objected to the solicitor's line of questioning. Petitioner's objection is without merit.

E.    Prejudicial Defense Witness Addy (Ground Six)

Finally, Petitioner asserts the Magistrate Judge erred in finding that trial counsel was not ineffective for calling Addy to testify, and that the benefits of Addy's testimony outweighed any detriment. However, as the Magistrate Judge recounted, Addy conveyed to the jury how much Petitioner loved his children and his wife, and how distraught he was over the pending divorce. The court notes that Addy only reluctantly revealed Petitioner claimed he would place his children in the vat of caustic chemicals, and discounted Petitioner's statements by testifying, "I could say I will kick somebody's ass in this courtroom, but that doesn't mean I will do it. Everybody says stuff like that." ECF No. 10-2, 80. Trial counsel was not deficient for calling Addy as a witness. Petitioner's objection is without merit.

## III.  CONCLUSION

For all these reasons, the court concludes that the PCR judge's rulings were not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding. Respondent's motion for summary judgment (ECF No. 9) is **granted**. Petitioner's § 2254 petition is denied and dismissed, with prejudice.

<u>CERTIFICATE OF APPEALABILITY</u>

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003); <u>Rose v. Lee</u>, 252 F.3d 676, 683-84 (4th Cir.2001). The court concludes that Petitioner has not made the requisite showing.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

March 21, 2016

**NOTICE OF RIGHT TO APPEAL**

**Petitioner is hereby notified of the right to appeal this order
pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.**